**Billy Stewart JEFFRIES, Petitioner**

v.

**James L. MORGAN, Warden, Respondent.**

**Civil Action No. 05–CV–66.**

United States District Court, E.D. Kentucky, Frankfort.

May 2, 2006.

Timothy G. Arnold, Frankfort, KY, for Petitioner.

Louis F. Mathias, Jr., Office of Attorney General, Frankfort, KY, for Respondent.

## OPINION AND ORDER

KAREN K. CALDWELL, District Judge.

On September 9, 2005, petitioner Billy Stewart Jeffries filed a pro se petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. Consistent with local practice, this matter was referred to the United States Magistrate Judge for consideration.

The Magistrate Judge filed his proposed report and recommendation on April 11, 2006. Based on a review of the state court record and the applicable case law relevant to federal habeas corpus petitions, the Magistrate Judge concluded that the petition is not entitled to federal habeas corpus relief. Accordingly, the Magistrate Judge recommends that petitioner's habeas petition be denied and that this action be dismissed and stricken from the docket.

On April 25, 2006, petitioner filed objections to the Magistrate Judge's proposed report and recommendation. This Court must make a *de novo* determination of those portions of the Magistrate Judge's proposed report and recommendation to which objection is made. 28 U.S.C. § 636(b)(1)(C). Having considered petitioner's objections, which the Court finds to be without merit, and having made a *de novo* determination, the Court hereby adopts the Magistrate Judge's proposed findings of fact and conclusions of law.

Accordingly, the Court, being otherwise fully and sufficiently advised, HEREBY ORDERS that

(1) the Magistrate Judge's report and recommendation [DE # 14] is ADOPTED as and for the opinion of the Court;

(2) petitioner's objections to the Magistrate Judge's report and recommendation [DE # 15] are OVERRULED;

(3) petitioner's petition for a writ of habeas corpus [DE # 1] is DENIED; and

(4) judgment will be entered contemporaneously with this opinion and order in favor of respondent.

### REPORT & RECOMMENDATION

WEHRMAN, United States Magistrate Judge.

On September 9, 2005, petitioner Billy Stewart Jeffries, through counsel, filed a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. The respondent filed a response and a motion to dismiss the petition on November 22, 2005.

In lieu of a formal response to the motion to dismiss, petitioner moved to compel expansion of the state court record. The court granted petitioner's motion in part, directing the respondent to provide a detailed list of what state court transcripts and/or tapes might be available for review by this court. The respondent filed a detailed list of items available in the state court record on February 17, 2006 without electing to file any additional portions of that record in this court. This matter has been referred to the undersigned magistrate judge for initial consideration and a report and recommendation. 28 U.S.C. § 636(b).

### I. Background

The factual and procedural history of this case was set forth by the state courts, first on direct appeal, and subsequently during post-conviction proceedings. On direct appeal, the Kentucky Supreme Court affirmed the conviction in an unpublished opinion rendered on October 15, 1998:

Appellant, Billy Stewart Jeffries, was convicted of murder and attempted rape. Jeffries was sentenced to twenty-five (25) years on the murder charge and ten (10) years on the attempted rape charge, with the sentences to run consecutively for thirty-five (35) years. He appeals his convictions to this Court as a matter of right. We affirm.

On February 20, 1995, Mary McKee left her house for a walk and never returned. The next day, her housekeeper became alarmed when Mrs. McKee failed to answer her door. The housekeeper contacted a neighbor. A search was conducted and Mrs. McKee's body was discovered in a yard between two houses. Her pantyhose and panties had been removed, her longish skirt was hiked up to her mid-thigh, and her blouse was ripped partially open. Blood was splattered on a nearby wall and teeth fragments were scattered near the body. There were smeared fingerprints on Mrs. McKee's right thigh and buttocks. According to the medical examiner, Mrs. McKee was beaten to death, apparently with the bloody rocks found near her body. Further, the medical examiner testified that Mrs. McKee did not die immediately from the beating but probably expired some twenty minutes thereafter.

On February 27, 1995, Jeffries was questioned by the police about Mrs. McKee's murder and turned over the clothes he was wearing on the day of the murder. Tests revealed the presence of blood on his jacket, sole of his shoe, and inside the tongue of his right shoe. There was no identification as to whom the blood on his jacket and the sole of his shoe belonged or whether it was even human blood. However, the blood found on the inside of the tongue of Jeffries' shoe was positively identified as Mrs. McKee's. Further, a palm print on Mrs. McKee's glasses, which were found next to her body, was positively identi-

fied as belonging to Jeffries. Finally, witnesses testified that they saw Jeffries in the general area where Mrs. McKee's body was found.

Upon questioning, Jeffries denied all knowledge of the crime. However, when he took the stand, he testified that he had lied to the police when they questioned him. Contrary to his earlier statements, he testified that on the evening of the murder he had been cutting through the yard in question and had tripped over a body. He testified that he could not even identify the gender of the body. He ran away because he was scared. He never checked on the well-being of the person he tripped over. He did not tell his mother or his father about tripping over the body, apparently because his parents were mad at him and telling them would require a confession that he had been drinking that day.

DE # 2, Exh. 2.

The Kentucky Supreme Court rejected the petitioner's arguments that there was insufficient evidence to prove that Jeffries murdered and raped the victim. The state court also rejected Jeffries' arguments that the trial court erred when it admitted evidence of unidentified blood on defendant's jacket and sole of a shoe, that the Commonwealth improperly was allowed to argue during closing that the defendant's clothes from the day of the murder were washed free of blood, and that it was error not to sever trial on the charges of attempted rape and murder.

Jeffries filed a Motion for a New Trial under Ky. R.Cr. 10.02 on June 9, 1998.[1] Jeffries argued that he was entitled to a new trial due both to the prosecutor's failure to reveal exculpatory evidence, and newly discovered evidence. Both the alleged exculpatory evidence and the newly discovered evidence concerned allegations that an uncharged person, John Dillon, was the true perpetrator of the crimes for which Jeffries was convicted. The Shelby Circuit Court denied Jeffries' motion for a new trial on August 29, 2001, and the Kentucky Court of Appeals affirmed that denial in an unpublished opinion dated October 17, 2003:

> We agree with the trial court that the evidence of John Dillon's involvement would not exonerate Jeffries, but merely implicate a possible accomplice. As to the theory that exculpatory evidence was withheld, we opine that the information withheld was not in itself exculpatory but possibly could have led to some admissible evidence. Therefore, we affirm.

> On February 20, 1995, Mary McKee was beaten to death with a rock. When Jeffries was questioned by the police, he denied knowing anything about the crime. He was asked, and did provide the police with the clothes he was wearing that night. The clothes had been washed but still had a residue of blood although forensics could not identify whose blood. Blood was also found on the tongue of Jeffries's shoe which was identified as Mrs. McKee's. Additionally, Jeffries's palm print was found on Mrs. McKee's glasses which were found next to her body. Two witnesses placed Jeffries near the scene at the time of death. At trial, Jeffries took the stand and claimed he tripped over the body and then ran away. He denied any involvement in the killing. The jury convicted Jeffries of murder and attempted rape. On June 9, 1997, Jeffries was sentenced to a total of thirty-five years' imprisonment. The Supreme Court affirmed the conviction in an un-

---

1. The motion referenced Ky RCr 10.06, but the state court's opinion refers to Rule 10.02.

published opinion rendered October 15, 1998.

. . . . .

In deciding if the evidence was material, the trial court asked whether the newly discovered evidence would with reasonable certainty change the verdict or outcome at trial. The court pointed to the evidence as summarized by the Commonwealth in its "Final Response" to the motion:

The Defendant lived in the vicinity of the murder, attended a party in that neighborhood on the date of that crime, was absent and unaccounted for at the party during the time frame of the murder and was seen and positively identified below and above the very spot where Mary Evelyn McKee was attacked and slain during the time frame for her murder. His palm print was found on her glasses, her blood found on the tongue of his high-top shoe, human blood found on the other shoe, blood found on his jacket, his jacket established to have been torn and other signs of a struggle found in the driveway areas above the murder scene (parts of the victim's watch and earrings). The Defendant was caught lying to the police about his whereabouts and movements during the afternoon in question. The trial court concluded that "None of the Defendant's new trial claims affect any of this evidence. The Defendant's conviction was affirmed on appeal. The evidence against the Defendant was strong and the new trial claims are unpersuasive, as they would not with reasonable certainty or with reasonable probability have affected the verdict."

The trial court denied the motion but did order a special grand jury to hear all the evidence presented against John Dil-

lon. The grand jury did not return an indictment against John Dillon. Jeffries appealed the trial court's denial of his RCr 10.02 motion to this Court.

On appeal to this Court, Jeffries's first allegation of error is that the trial court erred in not granting a new trial because the newly discovered evidence casts serious doubt upon Jeffries's conviction. The decision to grant a new trial rests within the sound discretion of the trial court. *Copley v. Commonwealth*, Ky., 854 S.W.2d 748 (1993). In *Collins v. Commonwealth*, 951 S.W.2d 569, 576 (1997), our Supreme Court quoted its earlier case of *Coots v. Commonwealth*, 418 S.W.2d 752, 754 (1967), for the proposition that "[n]ewly discovered evidence 'must be of such decisive value or force that it would with reasonable certainty, change the verdict or that it would probably change the result if a new trial should be granted.'" We believe that the trial court was correct in its analysis of the newly discovered evidence.

On September 16, 2004, the Kentucky Supreme Court denied discretionary review of the defendant's motion for a new trial. DE # 2, Exh. 16. The United States Supreme Court denied petitioner's petition for writ of certiorari on February 22, 2005. Petitioner then filed this federal petition for writ of habeas corpus.

In his current petition, petitioner argues that he is entitled to relief under 28 U.S.C. § 2254 for two reasons. Jeffries argues that the prosecutor violated the rule announced in *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), thereby compromising petitioner's constitutional rights. Petitioner additionally argues that the evidence was insufficient under *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). As will be explained below, neither of the claims

presented by petitioner entitle him to the relief he seeks. Because the present record is adequate for this court to fully review petitioner's claims, petitioner's pending motions to expand the record and for further scheduling will be denied as moot.

## II. Analysis

### A. Standard of Review

■ The Anti–Terrorism and Effective Death Penalty Act of 1996 (AEDPA) applies to all habeas corpus cases and requires "heightened respect" for legal and factual determinations made by state courts. *See Herbert v. Billy,* 160 F.3d 1131, 1134 (6th Cir.1998). Relief may be granted on a federal constitutional claim decided by a state court only if the state court decision is "contrary to, or involved an unreasonable application of clearly established federal law, as determined by the Supreme Court of the United States." *Williams v. Taylor,* 529 U.S. 362, 405, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000).

All findings of fact by the state court are presumed to be correct and only "clear and convincing evidence" may alter those determinations. *Mitchell v. Mason,* 325 F.3d 732, 737–738 (6th Cir.2003), *cert. denied* 543 U.S. 1080, 125 S.Ct. 861, 160 L.Ed.2d 824 (2005); 28 U.S.C. § 2254(e)(1). Legal conclusions made by state courts are also given substantial deference under the AEDPA. Section 2254(d) provides:

An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

■ As the Supreme Court recently reiterated: "A state-court decision is contrary to this Court's clearly established precedents if it applies a rule that contradicts the governing law set forth in our cases, or if it confronts a set of facts that is materially indistinguishable from a decision of this Court but reaches a different result." *Brown v. Payton,* 544 U.S. 133, 125 S.Ct. 1432, 1438, 161 L.Ed.2d 334 (2005); *see also Williams v. Taylor,* 529 U.S. at 405–406, 120 S.Ct. 1495.

### B. Insufficient Evidence Claim

Petitioner asserts that the Kentucky Supreme Court's decision affirming the conviction was contrary to or involved an unreasonable application of *Jackson v. Virginia,* 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979) and related Supreme Court precedents. However, in his direct appeal to that court petitioner neglected to cite to *Jackson v. Virginia* or other federal law.

### 1. Procedural Default

■ Based on petitioner's failure to cite to federal law in his direct appeal to the state court, the respondent now argues that petitioner's challenge to the sufficiency of the evidence has been procedurally defaulted. A petitioner seeking federal relief under 28 U.S.C. § 2254 must demonstrate that he has exhausted all available state court remedies by first presenting his claim(s) to the state courts. If a petitioner has failed to exhaust his state court remedies but no longer has the right under state law to seek further remedy, then he

is deemed to have waived or defaulted his claim in state court. A procedural default in state court will bar federal relief on the same claim, absent a showing of cause and prejudice.

■ To determine whether petitioner's claim is procedurally defaulted, this court must look to the pleadings filed by petitioner in state court. A petitioner must present "the same claim under the same theory" to the state courts as he subsequently presents to the federal court. *Pillette v. Foltz*, 824 F.2d 494, 497 (6th Cir.1987). To determine whether a particular claim has been "fairly presented" to the state court, a federal court should examine the petitioner's state court brief for:

(1) reliance upon federal cases employing constitutional analysis; (2) reliance upon state cases employing federal constitutional analysis; (3) phrasing the claim in terms of constitutional law or in terms sufficiently particular to allege a denial of a specific constitutional right; or (4) alleging facts well within the mainstream of constitutional law.

*Clinkscale v. Carter*, 375 F.3d 430, 437 (6th Cir.2004), *cert. denied* 543 U.S. 1177, 125 S.Ct. 1316, 161 L.Ed.2d 162 (2005) (*citing Newton v. Million*, 349 F.3d 873, 877 (6th Cir.2003)).

■ In his brief in support of his direct appeal, petitioner/defendant argued that insufficient evidence supported his conviction under the standards announced in *Commonwealth v. Jones*, 880 S.W.2d 544 (Ky.1994). Although petitioner cited no federal case law, the state court in *Commonwealth v. Jones* heavily relied on *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979) for its analysis. Therefore, although petitioner's presentation of his evidentiary claim to the state court did not clearly reference federal constitutional law, he relied on a state case which itself employed federal consti-

tutional analysis. In addition, both the legal and the factual basis for the claim presented to the state court were articulated in such a plain fashion—as insufficient evidence—as to not substantially differ from the federal claim presented here. Looking at the record as a whole, I conclude that the petitioner adequately challenged the sufficiency of the evidence in the state courts. Therefore, petitioner's evidentiary claim is not barred by the doctrine of procedural default.

### 2. Sufficiency Claim Without Merit

■ Although the claim has not been procedurally defaulted, petitioner's challenge to the sufficiency of the evidence does not warrant relief under § 2254 because the state court's decision is neither contrary to nor an unreasonable application of clearly established federal law, nor based on an unreasonable determination of facts.

Petitioner argues that in light of circumstantial evidence pointing to another perpetrator, that evidence of petitioner's presence at the scene was insufficient to support his convictions for attempted rape and murder. Petitioner notes that evidence admitted at trial included a hair left in the victim's panties which did not belong to the victim or petitioner, as well as a variety of fibers under and around the body not tied to petitioner. Petitioner argues that the circumstantial evidence linking him to the crimes was more consistent with him stumbling upon the body than with him committing the crimes. Petitioner asserts that no reasonable jury could have concluded, beyond a reasonable doubt, that it was Billy Jeffries and not an unknown other person near the body who attempted to rape and ultimately killed the victim. Specifically, petitioner notes evidence of a clean palm print left by petitioner on the victim's glasses as contrasted

with an unidentified muddy palm print found on the victim's left buttock. There was not a significant amount of blood on petitioner's clothes, even though the crime scene was extremely bloody. Finally, petitioner notes that he would have had to commit the offenses during an extremely short time frame based on witness accounts. Petitioner argues that the jury's conclusion that he committed the crimes required belief in the "least probable theory."

The Kentucky Supreme Court rejected the same arguments on direct appeal, holding that it was not clearly unreasonable for a jury to find Jeffries guilty of either count. DE # 2, Exh. 2 at 5.

> Jeffries' arguments on appeal that there was physical evidence pointing to another perpetrator of the crimes and that the crimes could not have been committed during the time line presented by the Commonwealth go to the weight and credibility of the evidence and not its sufficiency. Thus, these arguments have no bearing on the *Benham* standard.

The Kentucky Supreme Court additionally found there was no abuse of discretion under state evidentiary rules. *Id.* at 7, 9.

Petitioner now argues that the state court's analysis was contrary to or involved an unreasonable application of *Jackson v. Virginia* because the Kentucky Supreme Court "expressly refused" to consider *all* the circumstances and evidence and not merely that supporting an inference of guilt. According to petitioner, the state court's analysis is tantamount to a holding that evidence indicating that a party is innocent may be disregarded so long as the prosecutor introduces some evidence consistent with a finding of guilt. Under *Jackson v. Virginia*, however, "the relevant question is whether, after viewing the evidence in the light most favorable to

the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.*, 99 S.Ct. at 2789.

The Kentucky court found the evidence on the attempted rape charge sufficient to support conviction:

> The overt acts in this case are those that led to the discovery of Mrs. McKee on her back with her undergarments removed, her skirt pushed up, her blouse torn partially open, and with smeared fingerprints on her thigh and buttocks. The circumstances of the case are that the brutal attack on Mrs. McKee occurred in a yard away from the street, out of sight.

I concur with the state court that it was not clearly unreasonable in light of the above evidence for the jury to conclude that an attempted rape had occurred.

Petitioner's primary argument is not so much that it was unreasonable for the jury to concluded that rape was attempted, but that it was unreasonable for the jury to conclude that petitioner was the perpetrator rather than an uncharged person. Again, the Kentucky Supreme Court held otherwise, noting the following evidence:

> The evidence against Jeffries consisted of: blood on the tongue of one of his shoes that was positively identified as being Mrs. McKee's blood; a palm print on Mrs. McKee's glasses which was positively identified as belonging to Jeffries; witness testimony placing him near the place where Mrs. McKee's body was found within the time frame in which the murder occurred; and evidence that there was traces of unidentified blood on the jacket and shoes he wore on the day Mrs. McKee was murdered. While circumstantial, based on this evidence, it was not clearly unreasonable for the jury to find Jeffries guilty of murder.

The Kentucky Supreme Court also noted evidence that Jeffries was covered with mud on the day of the murder, but that the clothes he later surrendered to police were free of mud, blood, and dirt and appeared to have been laundered. Finally, the evidence showed that Jeffries initially denied all knowledge of the crime, but later testified at trial that he had lied to police when they questioned him. Contrary to earlier statements, he testified at trial that he had drunkenly tripped over the body, and could not even identify the gender of the body at the time. Yet his palm print was found on the victim's glasses, which were folded and resting next to the body. Jeffries testified that he ran away because he was scared and did not tell his parents about the body because telling them would require a confession that he had been drinking that day.

The fact that a hair matching neither Jeffries nor the victim was found in the victim's panties may give rise to an inference that another person was near the body. However, I concur with the state court's analysis that it does *not* render the petitioner's convictions invalid in light of the substantial evidence against him. I do not read the state court's opinion as disregarding or misinterpreting *Jackson v. Virginia*. Rather, the state court appropriately considered the record as a whole including the substantial evidence in support of petitioner's convictions.

In contrast to this case, the Sixth Circuit recently affirmed the grant of a writ of habeas corpus under *Jackson* in *Brown v. Palmer*, 441 F.3d 347, 2006 WL 618791 (6th Cir.2006). There, the defendant had been convicted of aiding and abetting the crimes of armed robbery and carjacking. The defense was that the defendant/petitioner had met and offered a ride to the perpetrator of the crimes just minutes before the crimes occurred. When the peti-

tioner and his passenger (the perpetrator) arrived at a gas station, the passenger pulled out a gun and committed the crimes. The Sixth Circuit held that the writ was appropriately granted because "viewing the evidence in the light most favorable to the prosecution, no rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* (citing *Jackson* at 319, 99 S.Ct. 2781).

In *Brown v. Palmer*, the Sixth Circuit first reviewed the element of "intent" required under state law to prove the "aiding and abetting" offenses for which the defendant had been convicted. Under state law, "mere presence, or even knowledge, that a crime is about to be committed is insufficient to prove guilt under an aiding-and-abetting theory." *Id.citing People v. Wilson*, 196 Mich.App. 604, 493 N.W.2d 471, 476 (1992). Noting that the state had presented no evidence of intent beyond evidence that the defendant was present at the scene of the crime and was acquainted with the perpetrator, the Sixth Circuit held that the evidence was nothing more than "reasonable speculation" even when viewed in the light most favorable to the state. The state "offered no evidence that Brown had ever met the gunman prior to arriving at the gas station, that Brown possessed a weapon or handed one to the gunman, or that Brown knew that the gunman was going to commit a robbery and carjacking."

We further note that the state offered no evidence to counter Brown's testimony that he did not know the perpetrator before offering him a ride on the night in question and that he had no prior relationship with the victims. Moreover, this court in *Hopson* upheld a grant of habeas corpus on insufficiency-of-the-evidence grounds where the evidence showed even greater contact by the defendant with both the shooter and the

victim than was established here. *Hopson*, 1987 WL 37432, at \*2. Although the state relies on evidence demonstrating that Brown "stared at the victims," never pumped gas at the gas station, attempted to flee following the gunshots, and failed to contact the police to retrieve his car, none of this evidence suggests that Brown assisted or encouraged the gunman in the commission of the armed robbery and carjacking or that Brown intended for the gunman to commit the offenses—both necessary elements for aiding and abetting under Michigan law.

Based on all the evidence, the district court determined that no rational trier of fact could have found the defendant guilty under *Jackson v. Virginia*, a conclusion shared by the appellate court.

Unlike *Brown v. Palmer*, in this case petitioner is not accused of an "aiding and abetting" offense but of actually committing the crimes of attempted rape and murder. The evidence was sufficient to prove all the elements of both offenses under state law. To prove attempted rape, the Commonwealth had to prove that the perpetrator "intentionally [did] or [omitted] to do anything which, under the circumstances as he believe[d] them to be, [was] a substantial step in a course of conduct planned to culminate in his commission of the crime." The crime attempted was the crime of engaging "in sexual intercourse with another person by forcible compulsion." KRS § 506.010(1)(b), KRS § 510.040(1)(a) (1995).

To prove murder, the Commonwealth had to show that "with the intent to cause the death of another person, [Jeffries] causes the death of such person...." KRS § 507.020(1)(a)(1995). The offense of murder required the jury to find that Jeffries acted "intentionally," meaning that "his conscious objective is to cause that result...." KRS § 501.020(1)(1995).

Petitioner does not seriously challenge the proof on any particular element except for the element identifying him as the perpetrator. Petitioner argues that evidence that a third person was in close proximity to the body (the hair and fibers) so strongly refutes the evidence that petitioner was the perpetrator as to render the verdict untrustworthy. Similarly, petitioner argues strenuously that the evidence as a whole "is more consistent with Billy Jeffries stumbling upon the body, than it is with Billy Jeffries personally killing Ms. McKee." Taken as a whole, petitioner argues that the evidence "was not sufficient to foreclose all reasonable doubts about the defendant's guilt."

In making his arguments, petitioner neglects the portion of *Jackson* which requires that the reviewing court view the evidence in the light most favorable to the prosecution. Although petitioner argues that some evidence points to another perpetrator, the same evidence viewed in favor of the prosecution could as easily have been interpreted by the jury as pointing to petitioner. For example, the lack of blood on petitioner's clothing was explained by the fact that the clothing had been laundered. The prosecution suggested that the unidentified fibers might well have come from petitioner's body. Other evidence suggested that petitioner was covered in mud at the time the crimes occurred. It would not have been unreasonable for the jury to assume that it was the petitioner who left the unidentified muddy print on the victim's body, in addition to the clean print left by petitioner on the victim's glasses. When viewed in favor of the prosecution, the circumstantial evidence identifying petitioner as the perpetrator is sufficient to support the convictions, notwithstanding the presence of a

single hair which did not belong to petitioner.

Because the state court's decisions are not contrary to and do not involve an unreasonable determination of the facts or an unreasonable application of clearly established federal law, petitioner is not entitled to relief under 28 U.S.C. § 2254 in reference to his second claim.

## C. 28 U.S.C. § 2254 review—*Brady* Violation

■ In his remaining claim, petitioner asserts that the state court interpreted *Brady v. Maryland* in a "manner that is flatly contradicted by the text of the *Bagley* decision." DE # 2 at 21. Petitioner claims that the state court's decision "undeniably resulted in a miscarriage of justice." *Id.* Although this claim presents closer issues than petitioner's *Jackson* claim, I again conclude that petitioner is entitled to no relief because the state court's denial of the claim does not involve an unreasonable application of clearly established federal law.

The specific violation of which petitioner complains is the failure of the prosecution to provide petitioner pre-trial with the name of John Dillon, an uncharged individual alleged by petitioner to have been involved in the crimes for which petitioner was convicted. Both the trial court and the Kentucky Court of Appeals held that the defense should have been provided with Dillon's name. However, the state courts held under *Bagley* that petitioner was not entitled to relief, notwithstanding the failure to disclose Dillon's name, because there was no reasonable probability that had the evidence been disclosed to the defense the outcome of the proceeding would have been different.

Petitioner presented his *Brady* claim to the state courts in the context of his motion for a new trial. For the most part, this is not a case in which petitioner presents new evidence to this court not previously presented to the state court.[2] In both the state court and this court, petitioner relies on *pretrial* evidence not provided to him though known to police (Dillon's name and statements made by Dillon during an interview/investigation), as well as *post-trial* evidence concerning Dillon's alleged involvement. The post-trial evidence included information received by the prosecutor after Jeffries was sentenced, advising that a detective had received information about the murder. Subsequent investigation revealed: 1) four or five witnesses stating that they had heard Dillon directly implicating himself in the crimes, or else that they had heard hearsay implicating Dillon; and 2) evidence discrediting Dillon's alibi.[3] Following the presentation of this evidence at an evidentiary hearing on petitioner's motion for a new trial, the trial court called for a special grand jury to hear evidence of Dillon's alleged involve-

**2.** One exception is petitioner's suggestion that he might present stronger evidence of Dillon's involvement if permitted a hearing in this court.

**3.** Petitioner argues that the alleged girlfriend, Jessica Peyton, later testified (before the grand jury) that she was only 11 years old at the time of the crime and had never had a romantic relationship with Dillon. Jessica Peyton's name appears in the Supplemental Report of Det. Mike Pratt as having been identified by Dillon on 12–3–97 (post-trial) as

Dillon's "girlfriend" at the time. The same report states that Dillon stated that he was with "a girlfriend at the end of Tenth Street" at the time of the crimes. Notably, Dillon does not state that he was with Peyton. The initial investigation included a statement by Mike Miller, dated 3/7/95, that he had observed John Dillon with an unidentified white male at "10 st. Between Bland & Clay St." Therefore, evidence that Dillon's alibi was discredited in post-trial proceedings is not well-developed.

ment. Despite calling for a grand jury, the trial court denied Jeffries' motion for a new trial. The grand jury was convened in May of 2000, but dissolved without taking action.

In light of the deference due to the state courts' determination of this issue, the opinion of the Kentucky Court of Appeals, which affirmed the denial of Jeffries' motion for new trial, is extensively quoted below:

> Jeffries filed his RCr 10.02 motion in the trial court contending newly discovered evidence, that subsequent to Jeffries's conviction, the Shelbyville police were investigating the possibility of additional suspects in Mrs. McKee's homicide. The motion contended the Commonwealth's theory at trial was that Jeffries acted alone. However, the Commonwealth had been investigating other potential suspects, and in discovery, had listed some sixty-five names of suspects or tips (although not the name, John Dillon). The motion also contended that the post-conviction investigation revealed evidence that a John Dillon had committed the crime, that a Linda Raisor provided the police with the name John Dillon, whom she suggested publicly admitted killing someone. A former probation and parole officer placed John Dillon within 7/10ths of a mile from the crime scene shortly after the murder. Chris Beach, an inmate at the Shelby County Jail, claims to have heard Dillon implicate himself in the murder. Supposedly, a girl named Tammy was also in the room when Dillon made the statement. A Pochahantas Biggers was supposed to have indicated that John Dillon had admitted to killing Mary McKee and she told Linda Raisor, who then told the police. A Tiffany Solace told a deputy sheriff that Dillon had murdered Mrs. McKee. John Dillon's former girlfriend suppos-

> edly heard him make statements and even admitted committing the murder to her. A Nicki Chesser was also supposed to have information about John Dillon's statement. Based on the allegations in the defense motion, the trial court granted Jeffries a hearing on April 17, 1999. The defense did not present witnesses at the hearing but did present attachments to its motion. The first attachment was a letter from the special prosecutor to defense counsel. The March 2, 1998, four-page letter summarized the investigation into John Dillon's alleged involvement in the murder. Also attached were quoted portions of the Commonwealth's opening statement and of the closing argument. The supplemental report of Detective Mike Pratt of his investigation was attached. Detective Rick Babiarz's report was attached as well as the defense's request for exculpatory evidence. Affidavits from Nikki Chesser, Chris Beach, and Billy Jeffries were attached. At the hearing, the defense became aware that the police had actually brought John Dillon in for questioning prior to Jeffries's conviction and had taped the interview. That tape was either lost or destroyed by the time of the motion and John Dillon had been eliminated as a suspect by the police. The trial court allowed the defense to also argue that suppressing John Dillon's name as a suspect in discovery amounted to a denial of exculpatory evidence which would also entitle Jeffries to a new trial.

> The trial court conducted an extensive hearing, allowed the parties to file briefs, and made these findings on the newly discovered evidence:

>> The Defendant claims that he is due a new trial because the Commonwealth was arguing to a jury at trial that the Defendant was the killer while the

Commonwealth had information that someone else had told Pochahantas Biggers that he had killed the victim, Mary Evelyn McKee. The Commonwealth has convincingly shown that it did not learn of any statement attributed to Ms. Biggers until months *after* the trial. Further, the Commonwealth has demonstrated that Ms. Biggers denies making such a statement to Linda Raisor, the woman who claims that Ms. Biggers told her about another person claiming responsibility for the murder. Ms. Raisor is a cousin of the Defendant's father, who has worked for Ms. Raisor. Ms. Raisor has known the Defendant since he was four years old. Given Ms. Biggers denial of ever telling Ms. Raisor that she overheard somebody confess to the crime and the closeness of Ms. Raisor to the Defendant's family, there is ample reason to doubt that the alleged statement of Ms. Biggers was made. This information does not warrant a new trial, as it would not with reasonable certainty change the verdict in this matter.

The Defendant is not entitled to a new trial based upon the affidavit of Nicky Chesser. Ms. Chesser's affidavit is no more than a statement that John Dillon told her that he killed the victim. Mr. Dillon denies making this statement and no eyewitness or forensic evidence links him to the crime. Mr. Dillon's denial and alibi were not impeached by any credible source. Further, the affidavit of Ms. Chesser dated June 3, 1998, reflects that Mr. Dillon allegedly told her about his responsibility for the murder during the summer of 1996. This would therefore have been known to Ms. Chesser months before the Defendant's March 1997 trial. The failure of Ms. Chesser to come forward with this information

before trial further casts doubt upon its reliability. Under all of the circumstances, the statement of Nicky Chesser would not with reasonable certainty have changed the verdict in this case.

The Defendant is not entitled to a new trial upon the affidavit of Chris Beach. Mr. Beach's own statements are suspect due to his contradiction of himself. He originally claimed that he saw John Dillon with a girl and overheard him describing a screaming old lady with whom John Dillon was going to take his turn when someone else got done, and that she kept screaming and he had to kill her. Mr. Beach's subsequent affidavit reads that he does not remember if Mr. Dillon said "I" did not mean to kill "her" or "we" did not mean to kill "her" and after that, Mr. Dillon was scared and crying. The inconsistency of the two Beach statements undermines his reliability and does not demonstrate that the claims of Mr. Beach would with reasonable certainty change the verdict.

The statement attributed to Tiffany Solace that both Mr. Dillon and the Defendant were involved in killing Ms. McKee would not with reasonable certainty change the verdict. The statement was merely a declaration that both men were involved in the crime, with no basis or underlying knowledge to support the statement provided. Such an unsupported comment does not undermine confidence in the verdict.

The Defendant contends that perhaps other people (of whom the Defendant had knowledge but did not produce any information from them pursuant to the new trial motion and proceedings) might have some knowledge re-

garding this case. Speculation about what somebody might know does not give rise to a reasonable certainty that the verdict would have been different. [August 29, 2001 Order of the Shelby Circuit Court at 2–3].

The defense's second theory contended the Commonwealth's failure to disclose the name and interview of "John Dillon" was a denial of exculpatory evidence and grounds for a new trial. The trial court found that:

> The statement of John Dillon, as described in the affidavit of Detective Rick Babiarz, shows that Mr. Dillon said that he was not in Ms. McKee's neighborhood at the time of the murder and that he did not know where the Defendant was at the time of the murder. This statement does not implicate Mr. Dillon in the murder and it does not implicate or exculpate the Defendant. This information was not favorable to the Defendant and he was not prejudiced by not having access to the statement. The statement was not material, as it does not give rise to a reasonable probability that its disclosure would have changed the outcome of the trial.

[*Id.* at 4]. . . .

. . . The trial court had a number of allegations and theories in the motion which did not hold up at the April 17, 1999, hearing. Although John Dillon was a suspect, Pochahantas Biggers denied that she ever told Linda Raisor that someone else claimed responsibility for the murder. John Dillon was placed within 7/10ths of a mile of the crime scene with enough time to get to the scene, but no other evidence of him actually involved in the crime. The inmate, Chris Beach, claims to have heard Dillon implicate himself in the murder. However, his statements do not clear Jef-

fries, but implicate Dillon also. Tiffany Solace supposedly heard the statement by Dillon, but again, if said, this would not clear Jeffries, but would implicate Dillon as an accomplice. Nicky Chesser supposedly heard Dillon say *before* Jeffries's trial that he killed Mrs. Mary Evelyn McKee. Like the trial court, we question why this witness did not come forward before the trial. Nevertheless, this statement alone, with all the other evidence pointing toward Jeffries's guilt, would not change the outcome of the trial.

Jeffries's second theory contends that the lower court's denial of a new trial based on a denial of exculpatory evidence violated his due process right to a fair trial. Jeffries is alleging that his discovery request for a list of suspects entitled the defense to John Dillon's name and the contents of the police interview. With this evidence, the defense contends *it could have* discovered the exculpatory evidence *before* trial. (Although the Commonwealth conducted a post-trial investigation, it was not until after the trial that the Commonwealth learned of the exculpatory evidence.) We agree, as did the trial court, that the defense was entitled to John Dillon's name before trial as a suspect, which could have led to exculpatory evidence. However, the fact that further investigation of John Dillon could have led to exculpatory evidence does not necessarily entitle Jeffries to a new trial.

We can all agree that evidence which helps establish that another person (*i.e.* John Dillon) may have been responsible for the killing is exculpatory. *United States v. Agurs*, 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976). In the case sub judice, there was a discovery request for a list of suspects, and John Dillon's name was not given to the de-

fense before trial. In *Brady v. Maryland*, 373 U.S. 83, 87, 83 S.Ct. 1194, 1197, 10 L.Ed.2d 215 (1963), the United States Supreme Court stated "Society wins not only when the guilty are convicted but when criminal trials are fair...." The Court was reviewing a case wherein the prosecution suppressed evidence favorable to an accused. In deciding whether or not due process required a new trial, the Court determined the test was whether the evidence was material, irrespective of the good faith or bad faith of the prosecutor. *Brady*, 373 U.S. at 87, 83 S.Ct. 1194.

When is the evidence material? *Kyles v. Whitley*, 514 U.S. 419, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995), reviewed a case similar to the present case which also involved a murder (in the Old French Quarter in New Orleans) and another suspect that did not appear at trial for the prosecution. The New Orleans police knew about this suspect prior to trial and even used his assistance in recovering evidence against Kyles. Kyles gave a number of inconsistent statements to the police, and if he did not do the crime himself, appeared to have been an accomplice. The exculpatory and impeaching statements evidence was suppressed. At trial,[1] Kyles's defense was that the eyewitnesses were mistaken in their observations and that he had been framed by "Beanie." Unbeknownst to Kyles, Beanie was the police informant that gave conflicting statements and other evidence pointing to Beanie as the murderer. The prosecution did bring Beanie into the courtroom so the eyewitnesses could chose between Beanie and Kyles, but continued to suppress the exculpating evidence. Kyles was convicted of murder and sentenced to death. On review, the Supreme Court referred to precedent, including *Brady*, 373 U.S. 83, 83 S.Ct.

1194, 10 L.Ed.2d 215 and *United States v. Bagley*, 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985), to reaffirm that, "favorable evidence is material, and constitutional error results from its suppression by the government, 'if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'" *Kyles*, 514 U.S. at 433, 115 S.Ct. 1555 (citation omitted).

FN1. The first trial resulted in a mistrial.

The *Kyles* Court discussed the materiality of the exculpatory evidence at great lengths in its discussion of the "[f]our aspects of materiality under Bagley ..." *Kyles*, 514 U.S. at 434, 115 S.Ct. 1555. We agree with Jeffries that the Court did say "[a] 'reasonable probability' of a different result is accordingly shown when the government's evidentiary suppression 'undermines confidence in the outcome of the trial' ". *Kyles*, 514 U.S. at 434, 115 S.Ct. 1555 (citation omitted). However, the Court was not changing the *Bagley* test of materiality as Jeffries contends. *See also Wood v. Bartholomew*, 516 U.S. 1, 116 S.Ct. 7, 133 L.Ed.2d 1 (1995).

Jeffries's argument concerning the application of the materiality test is a red herring. If the exculpatory evidence was available to the prosecution before the trial, we would have no reluctance in reversing and remanding for a new trial under *Kyles*, *Bagley*, and *Brady*, and *Funk v. Commonwealth*, Ky., 842 S.W.2d 476 (1992). What we have in the current situation is the suppression of the name and interview of a suspect before trial. Neither the name nor the results of the interview are in themselves exculpatory. This case is similar to *Wood v. Bartholomew*, wherein the Supreme Court quoted (with approval)

the Federal District Court's analysis of the suppressed evidence as being not exculpatory evidence but *"[t]he information withheld only possibly could have led to some admissible evidence."* *Wood,* 516 U.S. at 5, 116 S.Ct. 7 (emphasis original). *Wood* involved a couple of witnesses (in a murder case) that were given polygraph examinations (the results of which were not admissible at trial in the State of Washington). The witnesses did not do very well. In fact, one (Rodney) failed so badly that he should have become a suspect as an accomplice either before or after the fact. The police did not follow up on this lead and did not disclose the fact that the polygraph was even given.

Not only was the failure to disclose the results of the polygraph not itself considered exculpatory evidence, but the Court looked at the evidence against the defendant and concluded that "In short, it is not 'reasonably likely' that disclosure of the polygraph results—inadmissible under state law—would have resulted in a different outcome at trial. Even without Rodney's testimony, the case against respondent was overwhelming." *Wood,* 516 U.S. at 8, 116 S.Ct. 7. In Jeffries's case, the trial court made findings that none of the new trial claims affected the evidence against Jeffries, and after summarizing the evidence concluded: "[t]he evidence against the Defendant was strong and the new trial claims are unpersuasive, as they would not with reasonable certainty or without reasonable probability have affected the verdict." We agree.

DE # 2, Exh. 15 at 2–13.

Petitioner now argues that the state courts erred by considering only the failure to disclose Dillon's name in and of itself, without considering the "avenues of investigation" which the failure to disclose Dillon's name and/or statements may have cut short or eliminated. Petitioner argues that the state courts misinterpreted *Kyles* by failing to recognize that *Bagley* "is not a sufficiency of the evidence test" but instead requires relief upon a showing "that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Id.* at 435, 115 S.Ct. 1555. Petitioner asserts that the state courts mistakenly interpreted *Wood* as modifying the *Kyles/Bagley* standard.

 The Respondent argues that there was no *Brady* violation. In *Brady v. Maryland,* the United States Supreme Court held that the due process clause requires a prosecutor to disclose to defense counsel evidence which is favorable to the defense. In subsequent cases, the Supreme Court provided guidance on what evidence falls under *Brady.* First, the evidence must be material either to guilt or punishment. Second, failure to disclose it constitutes reversible error only when "there is a 'reasonable probability' that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *United States v. Bagley,* 473 U.S. 667, 682, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985); *Pennsylvania v. Ritchie,* 480 U.S. 39, 57, 107 S.Ct. 989, 94 L.Ed.2d 40 (1987); *Wood v. Bartholomew,* 516 U.S. 1, 5–6, 116 S.Ct. 7, 133 L.Ed.2d 1 (1995).

 "The mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome does not establish materiality in the constitutional sense." *United States v. Agurs,* 427 U.S. 97, 112, fn. 20, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976). In *Strickler v. Greene,* 527 U.S. 263, 119 S.Ct. 1936, 144

L.Ed.2d 286 (1999), the Court summarized its post-*Brady* rulings:

> We have since held that the duty to disclose such evidence is applicable even though there has been no request by the accused ... and that the duty encompasses impeachment evidence as well as exculpatory evidence.... Moreover, the rule encompasses evidence "known only to police investigators and not to the prosecutor."
>
> ... There are three components of a true *Brady* violation: The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued.

*Id.* at 280–282, 296, 119 S.Ct. 1936.

Respondent first asserts that the prosecutor "in fact turned over the information that John Dillon's name came up, before trial." By contrast, the petitioner alleges that the Commonwealth responded to petitioner's pretrial request for information by turning over dozens of names, but that the prosecution

> did not turn over Mike Miller's report that he saw John Dillon with an unidentified white male .... less than a mile from the scene of the crime, sometime between 5:10 and 5:20 p.m. on the day of the offense. It also did not turn over a subsequent interview with Mr. Dillon, wherein he denied involvement in the offense and claimed to be visiting a girlfriend at the time. The investigating officer would later testify that he made no effort to verify Mr. Dillon's alibi, and that he eliminated Mr. Dillon based on Dillon's grandmother's statement that she was keeping Dillon "on a short leash." By the time this "oversight" was discovered, the tape of Dillon's interview was either lost or destroyed.

The Respondent's assertion that the defense was provided with Dillon's name is directly refuted by the facts as found by both the trial court and the Kentucky Court of Appeals. Both courts concluded that Dillon's name had been suppressed. The Court of Appeals found: "In the case sub judice, there was a discovery requests for a list of suspects, and John Dillon's name was not given to the defense before trial." Because the facts found by the state courts are entitled to deference and the Respondent has not demonstrated that those facts are erroneous, this court declines to adopt the Respondent's contention that Dillon's name was in fact provided to the defense prior to trial.

On the other hand, the fact that Dillon's name was suppressed does not necessarily mean that *Brady* was violated. Dillon was questioned by an investigator prior to trial. The trial court concluded that there was no *Brady* violation because Dillon's pretrial statement was not material and because its lack of disclosure did not prejudice the defendant. The court noted that the statement did not "implicate Mr. Dillon in the murder" or "implicate or exculpate the Defendant."

> This information was not favorable to the Defendant and he was not prejudiced by not having access to the statement. The statement was not material, as it does not give rise to a reasonable probability that its disclosure would have changed the outcome of the trial.

The Kentucky Court of Appeals agreed that there was no violation of *Brady* because John Dillon's statement was not "material." The appellate state court distinguished John Dillon's original pretrial statement—which was neither exculpatory nor inculpatory—from the exculpatory evidence discovered post-trial, including the statements of witnesses who identified John Dillon as the perpetrator. "If the

exculpatory evidence [witness statements implicating Dillon] was available to the prosecution *before* the trial, we would have no reluctance in reversing and remanding for a new trial." However, the only evidence suppressed prior to trial was Dillon's name and statement, and Mike Miller's statement that he had observed Dillon and an unidentified white male seven-tenths of a mile away from the crime scene between 5:10 and 5:20 that day. Because the information known to the prosecution *alone* was not exculpatory, both the state courts concluded that the suppression of that evidence was not "material." In other words, there was no "reasonable probability" that the verdict was affected merely by the pre-trial suppression of the limited and non-exculpatory evidence involving Dillon.

Petitioner now argues that the state courts misinterpreted *Wood* and *Bagley* by failing to consider the evidence as a whole, including all of the hearsay statements of witnesses discovered after the trial. Instead, petitioner argues that the state courts improperly limited review to what was known at the time of trial. Petitioner argues that *Bagley* requires courts to consider post-trial evidence when a state's nondisclosure prevents the defense from discovering exculpatory evidence, by cutting off "avenues of investigation" which the defense might otherwise have pursued. According to petitioner, access to Dillon's initial statement would have led petitioner to further investigation, including ultimately the discovery of the alleged weakness in Dillon's alibi and that Dillon "was taking credit for the crime." DE # 2, at 17.

I disagree. A critical fact is that the evidence known by the police and/or prosecutor prior to trial was limited to the interview with Dillon, which was neither inculpatory nor exculpatory to Jeffries, and the statement of Mike Miller placing Dillon seven-tenths of a mile away from the crimes. It is highly improbable that if the prosecution had provided the defense with this relatively innocuous and non-material evidence, the defense would have been spurred to investigate so completely as to discover the witness statements and/or inconsistencies in Dillon's alibi. The subsequent witness statements implicating Dillon arose spontaneously after trial, and do not appear to have had any connection to the original investigation of Dillon. In short, the state court did not err in focusing on the fact that the exculpatory evidence implicating Dillon was not discovered by the prosecution until following trial.

*Bagley* and *Kyles* are distinguishable because neither case involved consideration of evidence discovered post-trial *by the prosecution.* In *Bagley* the Government was aware prior to trial that it had agreed to compensate two key witnesses for their assistance. However, the Government deliberately failed to disclose that information to the defense and in fact offered affidavits of the witnesses stating that their testimony was made "without any threats or rewards, or promises of reward." 105 S.Ct. at 3377. The defense discovered the falsity of the affidavits and impeachment evidence after trial. The Supreme Court remanded for "a determination whether there is a reasonable probability that, had the inducement offered by the Government ... [to the witnesses] been disclosed to the defense, the result of the trial would have been different." *Id.* at 3385. Likewise, *Kyles* involved the nondisclosure of clearly exculpatory evidence known to the prosecution prior to trial.

The facts of the instant case are closest to those presented in *Wood v. Bartholomew,* where the prosecution suppressed evidence of a polygraph examination of a key witness—the defendant's brother. Although the evidence would have been inadmissible at trial, the polygraph examiner concluded that the brother's denial of his own involvement in the crime indicated

deception. The Ninth Circuit concluded that the information was material under *Brady* and warranted habeas relief, because had it been disclosed, the defendant "might have led ... counsel to conduct additional discovery that might have led to some additional evidence that could have been utilized." 116 S.Ct. at 10. However, because even a confession by the brother would not have been inconsistent with the "overwhelming" evidence of the defendant's guilt, the Supreme Court held that it was not "reasonably likely" that disclosure of the evidence would have resulted in a different outcome at trial. Although the evidence in this case may have been less "overwhelming" than the evidence in *Wood v. Bartholomew,* the state court's analysis correctly applied the legal standards espoused in *Wood, Bagley, and Kyles.*

The state trial court held a hearing on Jeffries' motion for a new trial. Jeffries failed to present any witnesses at that hearing, but did present attachments to his motion in the form of a four-page letter from the special investigator to defense counsel summarizing the investigation into Dillon's alleged involvement and a supplemental report of the investigator. Jeffries now argues that if this court were to grant him a new hearing, he would call Dillon. "If he refused to testify, his statements could be admitted as statements against interest. KRE 804(b)(3). If he took the stand and denied involvement, he could be impeached on the basis of his prior statements." DE # 2 at 20, n. 2. Jeffries offers no explanation for his failure to call Dillon at the evidentiary hearing held in state court. Jeffries' failure to fully develop the factual basis for his claim in state court precludes further development in this court, absent a showing of cause and prejudice.

Aside from the critical issue of when the exculpatory evidence involving Dillon was discovered by the prosecution, the Respon-

dent argues that there is no "reasonable probability" that even the hearsay statements discovered post-trial would have had any impact on the outcome of the trial if admitted into evidence at that time. "Considering the fact that one of the hearsay witnesses would state that it was not Dillon, but Dillon and the Petitioner who committed the crime, defense counsel would have been hard pressed even to consider calling Dillon as a witness, understanding that this could have opened many doors for information not favorable to Petitioner." DE # 7, Memorandum in Opposition at 12. In other words, as in *Wood,* the newly discovered evidence does not do as much to exonerate Jeffries as it does to implicate Dillon, and therefore there is no "reasonable probability" that the outcome of trial would have been different.

### D. Actual Innocence Claim Based On New Evidence

 The essence of petitioner's claim is the newly discovered (post-trial) evidence regarding Dillon's involvement. However, the law is clear that the existence of newly discovered evidence is generally *not* a ground for relief under 28 U.S.C. § 2254. *Herrera v. Collins,* 506 U.S. 390, 400, 113 S.Ct. 853, 122 L.Ed.2d 203 (1993); *see also Simpson v. Jones,* 238 F.3d 399, 408 (6th Cir.2000). To obtain relief under an "actual innocence" claim, a petitioner must present at the least a persuasive demonstration of actual innocence. *Herrera,* 506 U.S. at 417, 113 S.Ct. 853. Petitioner's showing falls short of that showing in this case. As previously explained by the state courts and reiterated herein, the jury was presented with ample physical and other circumstantial evidence of petitioner's guilt.

### III. Conclusion and Recommendation

For the reasons stated herein, **IT IS RECOMMENDED THAT** the petitioner's

petition for writ of habeas corpus [DE # 1] be **DENIED,** and that this case be dismissed and stricken from the active docket. **IT IS FURTHER RECOMMENDED THAT** Petitioner's motion to compel the Respondent to file additional portions of the state court record, and for a further scheduling order [DE # 12], be **DENIED AS MOOT.**

**OBJECTIONS** to this Report and Recommendation must be filed with the Clerk of Court within ten (10) days of the date of service of the same or further appeal is waived. *United States v. Walters,* 638 F.2d 947 (6th Cir.1981); *Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985). Poorly drafted objections, general objections or objections that require a judge's interpretation will be afforded no effect and are insufficient to preserve the right of appeal. *See Howard v. Secretary of Health and Human Services,* 932 F.2d 505, 509 (6th Cir.1991). A party may file a response to another party's objections within ten (10) days after being served with a copy. Fed.R.Civ.P. 72(b).

April 11, 2006.